```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2010
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MARIEA BOWMAN,                                :
                                              :
                           Bowman,            :    08 Civ. 10123 (PAC)
                                              :
          - against -                         :    ORDER
                                              :
THE CITY OF NEW YORK, POLICE OFFICER          :
ASA BARNES, POLICE OFFICER KELVY              :
VASQUEZ, AND SGT. AMANJEET SANDHU             :
                                              :
                           Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Mariea Bowman ("Bowman") brings this action under 42 U.S.C. § 1983 against the City of New York, police officer Asa Barnes ("Barnes"), police officer Kelvy Vasquez ("Vasquez"), and Sergeant Amanjeet Sandhu ("Sandhu") (together, the "Defendants"). Bowman brings claims for unlawful entry, false arrest, and excessive force, and also seeks to hold liable the City of New York under the doctrine of *respondeat superior*.[1] Both parties have filed motions for summary judgment under Fed. R. Civ. P. 56. This case is replete with genuine issues of material fact which preclude summary judgment and, accordingly, both parties' motions are DENIED.

## BACKGROUND

The factual background of this case is substantially disputed. At approximately 2:44 a.m. on February 29, 2008, Bowman called 911 because her cousin, Darryl Epps ("Epps"), was

---

[1] Bowman's Amended Complaint also alleges causes of action for malicious prosecution, state law claims against the police officer defendants, and a claim for municipal liability against the City of New York under Monell v. Dep't of Social Services of New York, 436 U.S. 658 (1978). Bowman, however, has withdrawn these claims (Pl. Opp. Mem. at 16-17).

allegedly threatening her. (Pl. 56.1 ¶ 1.) According to Epps (who disputes the threat allegations), when police arrived at the house, he was asleep in his room. When overheard by the officers, he told them that he had been living in the apartment for the previous five months — a point that Epps says Bowman confirmed — and that he would be moving out the next day. (See Epps. Dep. 23-25.) Then, according to Epps, he went back to sleep. (Id. at 27.)

Bowman's version of the events of that evening differs substantially. According to Bowman, when the police arrived, Epps (1) said that he would be moving his things out the next day, (2) made an agreement with the officers that he would come back with a truck with which to remove his belongings (and that an police escort would accompany him when he returned), and (3) left the apartment around the same time as the officers did. (Bowman Dep. 72, 74.)

The next night, at approximately 11:12 p.m., Bowman called 911, allegedly in order to request an escort while Epps removed his items. (Pl. 56.1 ¶ 4.) At around the same time, Epps reported to police that Bowman refused to open the door to the house and had, therefore, unlawfully evicted him under New York City Administrative Code § 26-521.[2] (Def. 56.1 ¶¶ 1-3.) Epps also told police that Bowman had children inside the house and that Bowman was suffering from "emotional problems." (Id. ¶¶ 4-5.) At around 11:45 p.m., Officers Barnes and Vasquez arrived on the scene. (Id. ¶¶ 6-7.)

To substantiate his claim that he had been living with Bowman, Epps says that he told the officers that he had personal belongings inside the house and that he had paid rent. (Id. ¶¶ 8-10.) The officers apparently believed Epps' story and attempted in vain to persuade Bowman to open

---

[2] Under N.Y. City Admin. Code § 26-521(a)(3), "It shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer . . . [by] engaging or threatening to engage in any other conduct which prevents or is intended to prevent such occupant from the lawful occupancy of such dwelling unit or to induce the occupant to vacate the dwelling unit including, but not limited to, removing the occupant's possessions from the dwelling unit; removing the door at the entrance to the dwelling unit; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying the occupant with a key."

the front door and allow Epps access to the house. Eventually, at around 12:27 a.m., Sergeant Sandhu arrived, and Epps informed him about the alleged unlawful eviction. (Id. ¶¶ 14-15.) According to Sergeant Sandhu, at some point during the events of the evening, Epps showed the officers documents substantiating Epps's claim that he had been living in the house for over thirty days, although Sandhu later could not remember either the kind or number of documents Epps had actually produced. (Sandhu Dep. 74.)

Bowman claims that she came downstairs at the beginning of the incident, talked to the officers, told them she would not let Epps into the house, and then went back upstairs to sleep. (Bowman Dep. 101-102.) According to Sandhu, Bowman never specifically denied that Epps lived with her and simply said, "This is my house. I'm not letting him in." (Sandhu Dep. 75.) After several attempts to persuade Bowman to open the door over a period of hours — first asking and then demanding that she comply — the officers called the New York City Police Department's Emergency Service Unit ("ESU"). (See Def. 56.1 ¶ 18; Epps Dep. 38-39.) At about 1:43 a.m., ESU forced open the door and the officers entered, where they discovered that Bowman had apparently barricaded the doorway with furniture and a television. (Def. 56.1 ¶ 18; Sandhu Dep. 69-70; Epps Dep. 41.)

After entering the residence, the officers observed Bowman coming down the stairs towards them, and they placed her under arrest. (Def. 56.1 ¶ 21; Vasquez Dep. 23-25.) Bowman alleges that, upon the officers' entrance to the apartment, Barnes used excessive force, asserting that the officer grabbed her and threw her down onto the ground. (Bowman Dep. 114-115.) Then, according to Bowman, Barnes allegedly twisted her around and caused the left side of her face to crash against a television. (Id. ¶¶ 115-116.) Sandhu and Vasquez are not accused of

3

using any force in making the arrest, (Def. 56.1 ¶ 22), but are accused of standing idly by while Barnes used the alleged excessive force.

Following the arrest, police transported Plaintiff to Jacobi Hospital, where an examination showed no serious physical injuries. (Amended Compl. ¶¶ 13-14.) On March 3, 2008, Bowman sought medical treatment at Montefiore Medical Center. (Def. 56.1 ¶ 26.) Records from that hospital visit indicated: "no swelling\tenderness on the head. no injury noted, opens and closes mouth without difficulty, non-tender." (Id. ¶ 28.) The medical records further state that Bowman experienced "no abrasions\lacerations in the extremities, no swelling\tenderness in the extremities." (Id. ¶ 29.) X-rays also did not reveal any injuries. (Id. ¶ 30.) Bowman was discharged, however, with a diagnosis of a sprained shoulder and a jaw contusion. (Kunz Dec., Ex. M, Montefiore Medical Records, Bates No. 0065.) Later, an orthopedic specialist who examined Bowman's case reported that she had a "sprain, cervical spine" and a "left trapezius spasm." (Kunz Dec., Ex. M, Montefiore Medical Records, Bates No. 0077.)

## ANALYSIS

**I. Standard of Review**

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The evidence on each material element must be sufficient to entitle the movant to relief

as a matter of law.  See Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts.  Fed. R. Civ. P. 56(e)(2).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment.  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration.  Id.

**II. Unlawful Entry**

The police did not have a warrant to enter Bowman's premises and such entries are presumptively unreasonable.  See Payton v. New York, 445 U.S. 573, 586 (1980).  There are two exceptions to this rule: (1) when a person with authority over the premises in question consents to the entry, Illinois v. Rodriguez, 497 U.S. 177, 179 (1990); and (2) when exigent circumstances present an emergency to which the police must respond, Mincey v. Arizona, 437 U.S. 385, 392 (1978).  Given the factual contentions here, there exists a genuine issue of material fact as to whether the officers were reasonable in believing that Epps had the ability to give consent for the officers to enter the house that night — an issue which is determinative of the question of

whether the officers' entry was unlawful. Where the officers reasonable in determining that Epps was living at the apartment for thirty days? There are two different versions (and one interpretation by the police). These are fact questions for the jury.

With regard to exigent circumstances, Defendants cite the fact that Epps reported in his 911 call that Bowman had "emotional problems" and referenced that Bowman had children inside the house with her. (Def. 56.1 ¶¶ 4-5.) Additionally, they point to the fact that Bowman barricaded the door and refused to discuss the situation with police for two hours. (Sandhu Dep. 69-70; Epps Dep. 38-39, 41.) Defendants' deposition testimony, however, suggests that the Defendants may not have believed an actual emergency existed at the time of their entry. Indeed, Sandhu acknowledged that he did not believe an emergency existed inside the house. (Sandhu Dep. 47.) The unlawful eviction itself represents the only emergency identified by Vasquez, which certainly falls short of a need to render immediate aid. (Vasquez Dep. 20-21.) Further, Vasquez did not believe Bowman to be mentally unstable. (Id. at 25.) As a result, there are questions of fact as to whether exigent circumstances existed at the time of entry.

### III. False Arrest

The false arrest claim turns on whether the police officers had probable cause to arrest Bowman. The question of probable cause involves a similar inquiry to that discussed above with respect to the claim of unlawful entry — whether the police acted reasonably in relying on Epps' assertion that he had been living in the house for over thirty days and therefore was a victim of an unlawful eviction. For the same reasons as above, then, a genuine issue of material fact exists

6

regarding whether the police reasonably believed that they had sufficient information to establish probable cause for arresting Bowman for the crime of unlawful eviction.[3]

With respect to Defendants' argument concerning obstruction of governmental administration ("OGA"), (Def. Mem. 8-10), Bowman was not actually arrested for nor charged with OGA. OGA occurs when an individual "intentionally obstructs, impairs or perverts the administration of law or other governmental function." N.Y. Penal Law. § 195.05. Defendants point to the barricade she allegedly placed at the door and her refusal to open the door for officers. (Def. Mem. 10; Sandhu Dep. 69-70; Epps Dep. 38-39, 41-42.) Bowman maintains she opened the door and discussed the situation with the police, specifically telling them that Epps could collect his belongings from the back porch. (Bowman Dep. 102.) She then claims she went back to sleep, until the police forcibly entered the house. (Id.) There is a genuine issue of material fact as to whether Bowman actually disobeyed the orders of the police to discuss the situation after the initial conversation. Furthermore, if the police did not have the right to enter (a question for the jury) or probable cause to make an arrest (a question for the jury), then they would not be engaged in a "lawful" activity which is a predicate to an OGA charge. In any event, a summary judgment ruling for either party is unwarranted.

**IV. Excessive Force Claim**

Claims of excessive force utilized during an arrest are measured by an objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 388 (1989). This reasonableness test remains the standard even for arrests lacking probable cause. Jones v. Parmley, 465 F.3d 46, 62

---

[3] Plaintiff urges that because, under Payton, 445 U.S. at 586 & n.25, a warrantless arrest in the arrestee's home, absent exigent circumstances, is presumptively illegal, a false arrest claim is established here as a matter of law. This argument is unavailing. The legality of an entry leading to an alleged false arrest is not an element of a false arrest claim. See Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003).

(2d Cir. 2006). Here too, there is a sharp factual dispute as to whether injuries were suffered and, if so, to what extent.

Although her visit to Jacobi Hospital the night of the arrest produced a finding of no major injuries, upon discharge from Montefiore Medical Center, Bowman received a diagnosis of a jaw contusion and a shoulder sprain. (Kunz Dec., Ex. M, Montefiore Medical Records, Bates No. 0068). Additionally, an orthopedic specialist later concluded that Bowman suffered from a "sprain, cervical spine" and a "left trapezius spasm." (Kunz Dec., Ex. M, Montefiore Medical Records, Bates No. 0077). As such, given that the events of the evening in question are uncertain, a genuine issue of material fact exists regarding whether the force used by the officers was reasonable.[4]

## V. Qualified Immunity

Defendants argue that the defendant officers and their actions are protected under the doctrine of qualified immunity. A finding of qualified immunity requires a showing that: "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998). At this stage, it cannot be said that the City has established either requirement. Stated differently, because it is unclear exactly what happened on the night in question, the court cannot determine on summary judgment whether it was objectively reasonable for the officers to believe that they did not violate clearly established law.

---

[4] Additionally, as stated above, a genuine issue of material fact exists regarding whether the police had probable cause to arrest at all. Without probable cause, a reasonable jury could find any force unjustified and even a minimal injury to Bowman could permit a conclusion of excessive force.

## CONCLUSION

For the foregoing reasons, both Plaintiff's and Defendants' motions for summary judgment are DENIED. The Clerk of Court is directed to close the motions at docket numbers 30 and 36.


Dated: New York, New York
       September 30, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge